117, Sam's Club v. Patricia O'Connell Thank you, Mayor. I'd like to please report to the Council. Michelle Lafayette on behalf of Sam's Club. As I said here this morning, I don't think this case is all that much different than the other cases, other than it's captioned, Sam's Club v. the Commission. And it's captioned that way because the Circuit Court stepped in after the initial Commission's decision of September 10, 2015, and found that that decision was against the manifesto of the evidence, bringing the case back to the Commission, and the Commission issued decision number two. I refer to that in my brief as Commission decision number one, Commission decision number two. If I could just interject here, so we don't go off on a tangent, not that I'm suggesting you might. You're aware of the fact when it's reversed and another decision is issued on remand, we examine the propriety of the original decision, not the second decision. Correct. And that's where I'm going with this, is that we are here on Commission decision number one, and whether that was against the manifesto of the evidence. And it is Sam's Club's position that it was not. And the Circuit Court incorrectly reweighed all the evidence, substituting its judgment for that of the Commission. And we're asking the Court to release State Commission's decision number one at this point. There are two basings on which the Circuit Court reversed Commission decision number one, one being as to causality relating to the shoulder, and the second being permanency, meaning whether Ms. Varillo was permanently totally disabled versus the 40% and as a whole as found by the Commission. And it's our position there was support for the Commission's decision in the record for both of those findings. The causation as it went to the shoulder came down to several pieces of evidence, one of which was the video of the actual fall from the store. The Commission adopted arbitrary reviews. Did Bernstein review the video? He did review the video. I'm not so sure that Dr. Bernstein's review of the video and his opinions as to causation pertain necessarily to the shoulder. There is a question of whether she fell straight backwards, bracing herself over her arms, whereas her arms were out to the side. And the video showed that she fell forward, not backward, right? Or was it the opposite? The video actually showed she was falling backwards, but that her arms were out to her sides, not used to brace herself behind her. Which would be inconsistent, the video, with her mechanism of injury. I'm sorry, I didn't catch that. The video, then, would have impeached her mechanism of injury, right? Correct. And that's what the Commission found. And the Commission was looking at the opinions of the doctors that treated her from the shoulder, Dr. Morgenstern, Dr. Giannoulias, their expert, Dr. Koh, who just reviewed the evidence and provided opinions as to causation, and Dr. Silver. And what the Commission said is that Dr. Koh, the medical orthopedic surgeon, had found his understanding of the accident was inconsistent with the video. Dr. Giannoulias, and I think this may be where you're getting that she fell forward, he put it as though she fell forward and braced her hands. The Commission, although there was medical opinions favoring the claimants, the Commission found that the video, they had to have reviewed the video, which would have put it in a different light, is that correct? Correct, yes. And then, discounting those opinions, the circuit court commented on the fact that one of the opinions when the Commission went through all of the doctors, they did not mention was Dr. Morgenstern, but a case that came down after all of the briefs in this case were submitted by this court, which was Cisco Food Service of Chicago, and it was a published decision, there was, the circuit court, just Lopez-Carroll in particular, had said that it was significant that the Commission did not consider Dr. Reagan's letter, which was sent in 2011, and this court, when discussing that statement, I'm going to quote, the fact that the Commission did not mention the letter in its original decision does not support the conclusion that it ignored the letter, end quote. I think the same can be said here. Just because they don't mention it in the analysis, Dr. Morgenstern has mentioned in the statement of facts, you can't assume that the Commission didn't consider it. The Commission just discounted it and didn't find it significant. And what we're getting to here is the fact that the Commission drew from the video surveillance as well as medical evidence, and they discounted the medical evidence and opinions because it was not consistent with what they saw on that video. And notwithstanding that, which buttresses your case more than usual, I mean, the Commission certainly feel is free to adopt the opinion of one doctor even if it's contradicted by several doctors, correct? Correct. But you're saying here not only did they do that, but they had legitimate reasons based on the video to do that. Correct. Does that summarize the argument? Yes, it does. And the Commission is a fact finder. The Commission judges the evidence. As this Court has mentioned yesterday where I was sitting and listening to arguments and as I've been sitting here today, it's the role of the Commission to be a fact finder. It's not the role of a certain court or this Court. This Court determines whether or not there's evidence in the record to support the Commission's decision on that issue. There is. And when you get to the next issue, which is the permanency issue, again, there is evidence to support the Commission's original decision as entered in September 2015. I want to talk about the permanent total issue. There is some question. There is evidence in the record that would support the Commission's original decision as it relates to the shoulders. But the evidence that the Commission relied on to deny permanent total is just wrong. It's just simply wrong. They allege three factors when they denied the permanent total. They found that the FCE report of April the 10th related the claimant's difficulty standing to her condition of ill being in her lower back, which did not require surgery or right ankle, and she never attributed the work accident. However, the report itself states that it's not exclusively related to those difficulties or any single thing. Instead, the report states that she exhibited multiple musculoskeletal defects that have an impact on her overall level of functioning. Those defects also include range of motion, cervical motion, tenderness over the cervical vertebrae, reduced strength of her shoulders, neck, et cetera, and so on. Now, there's absolutely no question that the condition of ill being of the cervical spine is accident-related and compensable. You're not even fighting that. So their reference to the FCE as being one of the factors just doesn't hold water, because if it's partially based on the cervical spine, it's related. They also argue that Entenberg, quote, conceded that the claimant is capable of sedentary duty. That's simply wrong. Her report says that the claimant is capable of, quote, less than sedentary work due to her limited ability to sit, stand, walk, and lift. Her opinion does not support the denial of TPD. And lastly, the original decision to deny PB is reliant on the fact that the claimant did not conduct a work search. Every one of the jobs identified by Sam's Club were classified as sedentary, and they required a combination of sitting, standing, and walking, which everyone said she couldn't do. So where is the support in this record for the denial of permanent total in Lyda Entenberg's opinion? What the Commission did is they did not find Entenberg's opinions to be credible. I think you can take that from this decision. And they're opting not to rely on her opinions as to employability here, and there's underlying disputes as to the extent of disability. Dr. Bernstein, in particular, says she's capable of lifting up to 20 pounds, which would be greater than sedentary. So there are issues that go to employability here, and the Commission is considering that evidence and affording the weight that it's going to give to that evidence. The Commission also notes that when the claimant testified as to her current compliance, she concentrates on difficulties with walking and standing. She's not concentrating on difficulties or really alleging much that would be related to the cervical spine component of this case. The FCE report says one of the contributing factors to her difficulty is the cervical spine condition. To the limitations that she has, it's one of the contributing factors, but it's not the sole factor. It doesn't have to be the sole factor. It needs only be a factor. No, I understand that. But what the FCE relies on as to her limitations with walking and standing is the lower extremities and foot condition and the low back condition. There's no question she's got these conditions. And the shoulders that are injured, but so is the cervical spine. As long as the cervical spine is a cause of her condition, then it's compensable as such. And if it contributes to her inability to work or puts her into an odd lot because of that condition in combination with others, then I'm at a loss to understand why she didn't get permanent total. Well, because the commission, part of what went into this was the commission's assessment of her own credibility. And at first, the commission got the arbitration decision. So the arbitrators got a very detailed analysis of how she perceives the claimant's credibility. And she had difficulty rectifying the claimant's presentation and just overall deconditioning, inability to answer direct questions, laxing in Spanish, and uses all of her credibility findings and the commission that adopts those to support what its ultimate conclusions were on all the other issues, whether it was permanent total disability causation as to the shoulders, the award for temporary total disability benefits, the award for medical benefits. The claimant's overall credibility is at issue in this and whether or not the commission finds her to be permanently and totally disabled. I'm only referring to the reasons that arbitrator Mason gave for denying permanent total. And it appears to me that she's relying on things that just simply aren't true. Well, she's breaking it down to each component of the claimant's injury or condition. Well, I mean, yes. I'll read you the paragraph. I'm in the arbitration decision. While Susan Nettenberg viewed Petitioner as essentially unemployable, she conceded that as a 2012 functional capacity found to show that Petitioner was capable of sedentary duty. No, she didn't. What she said in her report was she's capable of less than sedentary duty. Now, that's pretty significant. I mean, I don't understand the permanency finding in the original decision. I really don't. But go ahead. Well, I think what you're getting to is what the arbitrator notes in the decision. This was a complicated case on all issues. Credibility was at the core of this issue just as it was at the core of the other issues. One of the things that you see throughout the record is whether or not the claimant has any motivation to return to work. And there seems to be a lack of motivation. And arbitrator Mason is picking up on that when she goes through the facts and when she talks about the various testimony that is offered. I think she also points out that the significant condition is the cervical spine, but the focus, and I do think the functional capacity motivation's focus was to some extent on the lower extremities in terms of the standing limitations and abilities, that's where that's driving from, that are not as significant as she is alleging them to be when she comes in and she testifies at the hearing. I mean, she says she's using a four-pronged walker, she's, you know, using a shower chair. Am I missing something, or did the FC report of April 10, 2012, state to her, she has decreased tolerances for standing, sitting, walking, reaching, and lifting above her shoulder level, which together constitute a severe functional limitation beyond sedentary work category. Is that what it says? I don't have it in front of me, but if you're reading from it, I do not question that you're not reading something out of it, certainly. I didn't bring the whole record with me on the FCE today. Did Sam's Club identify any jobs that she was capable of that were classified as less than sedentary? The jobs that were in the FCE would have been in the best sedentary level, but it's also in a position she's greater than sedentary capabilities. Dr. Bernstein gave her restrictions that were 20 pounds lifting. He disagreed with the FCE at that point. And the FCE was prepared by whom? The physical therapist. And I would also note there's no current physician referenced on the FCE, and there's no physician other than Dr. Bernstein taking what his examination findings are and comparing them to what she's capable of doing. Dr. Malik, which the arbitrator really discounts Dr. Malik in a lot of ways, on September 10, 2010, which was his last note, says she's not a candidate for surgery and just recommends the FCE, and then the FCE doesn't take place until 2012. So I think you can even discount the FCE and go back to Dr. Bernstein's 20-pound lifting restriction, which then gets you out of that sedentary category. What does Ettenberg say? I'm sorry? What did Ettenberg say? He said Ettenberg was rejected by the commission? Yeah, they didn't adopt Ettenberg's opinion. Ettenberg said, quote, less than sedentary work. And she's relying on an FCE, which no physician on the petitioner side has really rectified at that point. But the FCE says she can't stand, she can't sit, she can't walk, she can't reach, she can't lift above her shoulder level. And the only thing you've got is someone says she can lift 10, 20 pounds. But what about sitting? What about standing? What about the combination of these things? And is her cervical spine condition a contributing factor? According to the FCE, it is. Well, it might very well be to the sitting, too. Standing? So I don't know. I mean, they don't discount the FCE. I think they misstated is what they did. They misstated the FCE. It doesn't say what they would do. Mason says it says. Well, I think I'm going to say Mason, who gives a very thoughtful approach to cases, gives a very detailed analysis in all cases. It's not just a cursory summary of things. She discusses all of the evidence in the factual findings, and then she gives an inference to that, which are inferences that she can draw from all of the evidence in the record, and then the commission can then draw from all of the inferences in the record as the fact finder. And that's what they've done here, is they've drawn inferences from that evidence. And whether a court agrees or disagrees that there's factual evidence to support that, whether they've mentioned it there or not, you can still affirm this decision in its entirety. You'll have time now. Thank you. Thank you. Counsel, you may respond. Thank you, Your Honor. Good morning, Justices. May it please the Court. I don't think I have ever had a case before in many years where we've seen an accident on video. It's certainly pleasant, and yet we're still arguing about what the mechanism of injury is. I assume that the justices that reviewed the video were arguing about whether or not the claimant's arms were behind her when she landed or out to the side. I took a screenshot of the video. It's kind of hard to see from back there. I blew it up. It's kind of blurry. But we can see that her arm's like this. This is the moment she impacts the floor, right-hand impact of the floor, left-hand impact of the floor. So hopefully we can put away what these allegations that her arms were out to her side, that the doctors who opined that her shoulder condition was caused by a fall, and her arms were behind her. That's not based on the record. Why is it only one doctor, apparently Bernstein, that reviewed the video and the others didn't? Dr. Cote reviewed the video. He testified to it in his deposition. And the other ones that opined didn't? They were treaters. Well, it certainly gave the commission a basis for discovering her testimony. The basis for discovering her testimony is that her arms were off her side. Sorry about that. And we know that's wrong. So this is a decision where the commission made a lot of errors. And I know reviewing the commission's decision on the medicals weight of the evidence standard. That's the commission's primary finding. But this court does have a role in reviewing the commission. And it has a role in safeguarding us against an abuse of discretion, against clearly wrong findings of fact by the commission, which is what we have here. As we've discussed, the reasons that are stated in the commission's decision denying her an open disability of infants are wrong. They're demonstrably wrong. And you can't go back and say, oh, well, the commission must not have found Ms. Entenberg credible because they discounted her opinion, didn't find her credible. Well, it didn't say she wasn't credible. It just misstated her testimony. So it's not a credibility finding against Ms. Entenberg. It's getting facts wrong. And this notion of the petitioner was incredible. Again, the arbitrator in the commission didn't say the petitioner was incredible. It pointed out that she's bizarre. She has trouble testifying after an hour because she's just so deconditioned. She starts mumbling. She starts talking in Spanish to figure out how she's going to answer in English. But it doesn't say she's not credible. It finds her, as I mentioned in my brief, it finds her credible. Two points in the decision. When she's testifying about various points about not returning to work and things like that, she's the one they find credible. The one who's not credible is Dr. Bernstein. In the points in the decision they talk about, Dr. Bernstein said, well, she basically faked the accident. I viewed the video, and she basically faked the accident. She sort of maneuvered the role. That's clearly wrong, and the commission disagreed with her. The commission also disagrees blatantly or explicitly with Dr. Bernstein saying she doesn't need further care after this person was hit in July of 2008. The commission clearly says we don't agree with that at all. So if they're not agreeing with Dr. Bernstein, there's no basis for them to say, well, she's capable of work. The only credible evidence is the research from the FCD, so she must be sedentary. And there's no basis to say, well, the shoulder condition is not related to the shoulder injury or not related to the injury because we've got doctors, Dr. Koh and Dr. Morgenstern, who have an accurate history of the injury of the shoulder, landing with the arms behind her, jarring her shoulders. Counsel points out that the commission is not obligated to adopt the testimony of an unrebutted physician. That's true. That's a solvency case. Also Kraft General Foods. But, you know, there's this whole thing about Kraft General Foods. You need a reason to discount an unrebutted physician or an unrebutted expert. An expert says the earth is flat. The commission is not obligated to adopt that opinion. But there has to be a reason. You can't just arbitrarily say, well, all these doctors who have an accurate history and who are biased in saying she faked the accident are wrong. There needs to be some addition. Wasn't there a reason? They said they didn't view the video. No, the reason the commission gave is they said that her arms were out behind her when, in fact, her arms were to her side. And we know that her arms were to her side. What they did say is that she fell backwards without using her arms to brace herself when she fell. That's what they said. And I think the contention was that she fell on her butt. She didn't fall on her arms. Right. And we know that she didn't fall using her arms to brace herself. Well, I don't know that her arms are out to her sides. I don't know that she braced herself. Well, we can see it here. Well, no, she's on her butt there, isn't she not? Her arms are here in her right hand. But is her butt on the ground in the picture? Yes. Which got there first, her arms or her butt? The video is not exactly where it's going. Well, that's not what the commission found. The commission found the video shows the petitioner's arms going out to her sides. Right. She's out like this. Is she not? No, she's not. Is she like this? Yes. I don't think so. I think she's like this. Counsel, there is no evidence in this record that her arms hit the ground before her butt hit the ground. I'm not saying they hit the ground before her butt hit the ground. I'm saying they all hit the ground. They also found in this record that her shoulder MRIs did not show any acute findings and Silver did not document any discreet tears in his operative reports. It wasn't solely based on a rejection of the Bernstein testimony. They found a lack of testimony after she was examined. Her operative records did not show that she had any discreet tears in the shoulders. Now, I will grant you that arbitrator Mason disposed of the shoulders in one paragraph. Well, two paragraphs. She wasn't persuaded by Coe's opinion that the accident led to the need for shoulder surgery. He's not an orthopod and didn't explain how the backward fall could result in the aggravation of a preexisting impingement syndrome, is what she said. Right. I mean, his testimony was that she threw her arms back, charring her shoulders, which resulted in the aggravation of a preexisting condition of impingement syndrome. So, the arbitrator and, of course, the commission adopted that statement as wrong. It's clearly against the manifesto to say Dr. Coe didn't explain it, but he did. And there's no contrary evidence. Dr. Bernstein didn't even apply it on the shoulders. There's nobody applying it on the shoulders except for Dr. Coe and then Dr. Morrison who also has an anger disorder. What did arbitrator Mason say about Dr. Bernstein's opinion vis-à-vis the shoulders? Dr. Bernstein had no opinion vis-à-vis the shoulders. Didn't Bernstein apply the claim that the mechanism of injury during the accident did not cause the condition of the shoulders? No, he testified that he's not. He stated that the claimant did not report shoulder pain during the initial IME. Right, he did testify. Her diffuse complaints were not certain to originate from the incident depicted in the video. And based on the video, we could not imagine how the fall injured her shoulders. Right, because he felt she fainted. But he did not have an opinion regarding her shoulders. He's not a shoulder pain specialist. And where in the, in Commissioner, or arbitrator Mason's opinion that the Commissioner adopted, did they reject his testimony in that regard? Regarding the shoulders? Yeah. They didn't address it regarding the shoulders. Because he had none regarding her shoulders. Could not imagine how the fall could have injured her shoulders is not an opinion? Well, that's what he said. Okay. But the Commissioner is rejecting Dr. Bernstein's opinion that her fall was manipulated. Well, we understand that. There's no question. He said she fainted the fall. Right. And they didn't buy that. But they didn't reject his medical opinions. I cannot see one instance in this decision where they adopted his medical opinions. But you told me before that they rejected it. Right. They didn't reject it. He had medical opinions, and they never rejected them. I don't see one place in the decision where they adopted Dr. Bernstein's opinion. You and I, you're talking about adopting. I'm talking about rejecting. Okay. We're going to get an agreement here that they didn't reject him. They're silent on them, apart from the ones that they disagree with. Continue your argument, Counsel. Okay. I don't know. I think they're explicitly disagreeing with Dr. Bernstein in some ways. Well, if they disagreed with him on medical opinions, I might agree with you. The only thing they disagreed with him on is his notion that this lady faked this accident. They also disagreed that she was engaged in symptom magnification. As the Commissioner pointed out, the Arbitrator and the Commissioner pointed out, that no, the doctor found that, and the FCDs were valid. And the Arbitrator also noted that Dr. Bernstein said no, she did not go to care after July 30, 2008. And they rejected that as well. Did they reject all conservative care after July of 2008? The Commission, the Arbitrator said, I don't agree with Dr. Bernstein, but I think that's a good day to call off care. And the FCDs said that. Excuse me, didn't the Arbitrator also say in there that she received no benefit from the conservative care after that date? I don't know. Would you like me to read it to you? Sure. Okay. Arbitrator declines to award any expenses relating to treatment rendered by Drs. Ciccarone, Osmond, and Hansen after July 31, 2008, the date of Dr. Bernstein's first examination. While the Arbitrator disagrees with Bernstein's assessment as to the victim,  the Arbitrator finds that the date of Dr. Bernstein's first examination would be an appropriate cutoff point for the initial course of conservative care. The record shows that the petitioner would derive no lasting benefit from the care. All right. That being said, Dr. Bernstein's opinion was that she did not have a lumbar injury. Dr. Bernstein's opinion was that she had stenosis in her cervical spine, which maybe he felt needed some treatment. But he had no opinion, or his opinion, that she did not have an injury in the lumbar spine, so the Arbitrator is not using his opinion to cut off care because she awarded care before that, and Dr. Bernstein felt she needed no care for the lumbar spine. So, yeah, there's no reliance on Dr. Bernstein's opinion at all on the Petitioner's decision. That's why it's appropriate for this appellate court to say, well, you could have gone with Dr. Bernstein, but you're clearly not going with Dr. Bernstein. The Commission's clearly not going with Dr. Bernstein. Anyway, there's many flaws in this decision. Back to the statements that you're going to hear. The Circuit Court was correct to remand this to the Commission to take a second crack at it. Excuse me. And the Commission, in the second decision, did correct this flaw. I think the first decision goes clearly against the manifest way of the evidence, and I ask that you oppose the Circuit Court's decision. Thank you, Counsel. Counsel, you may reply. I have no other questions. Well, I do have a question on Ettenberg. You're saying Ettenberg was rejected by the Commission in the first decision? What I'm saying is that they weren't relying on her opinions as to permanent total disability and unemployability. That's our position. No, there's no question they didn't rely on her opinion because they misstated it. But I think in its entirety, they weren't going to rely on her opinions. Well, once they misstated her opinion, there was no reason to rely on it. Well, I would disagree that they misstated it. I think they were looking at her testimonies entirely and drawing inferences from it. So that the Commission's misstatement of Ettenberg as saying she's capable of sedentary duty was in error? That she was? In her original decision. I don't know that I would say it's in error because I'm not so sure I agree with the position that she was that she didn't state that she was capable of sedentary employment. Should I read it to you again? When I read her, you know, the evidence and things. Well, if her report says that it's less than sedentary work, okay. I would not disagree with what's in the report. Okay. All right. Thank you. Thank you. Thank you, counsel, both for your arguments in this matter. We've taken an advisement and written dispositions.